UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

CONERGY AG,

              **Plaintiff,**

        **- against -**

MEMC ELECTRONIC MATERIALS,
INC. and MEMC SINGAPORE PTE.
LTD.,

             **Defendants.**

-------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 4906 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/13/09

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Conergy AG ("Conergy") brings this action to seek a declaration that a ten-year Solar Wafer Supply Agreement ("Agreement" or the "contract"), under which it purchases silicon wafers from defendants MEMC Electronic Materials, Inc. ("MEMC") and MEMC Singapore Pte. Ltd. ("MEMC Singapore") for use in manufacturing solar photovoltaic panels, is void and unenforceable. Conergy also claims that defendants breached the Agreement. Defendants have moved to dismiss certain of the claims. For the following reasons, defendants' motion is granted in part and denied in part.

## II.    BACKGROUND

### A.    Facts

#### 1.    Conergy's Business Plans

Conergy is a solar company that was founded in the 1990s and whose specialty is "the planning and installation of solar photovoltaic systems to generate electricity from sunlight, including stand-alone facilities for homes and businesses as well as large scale plants that supply power to regional transmissions grids."[1] By 2003, Conergy had become one of the biggest solar companies in Germany.[2]

Around this time, Conergy decided to expand its business to include the manufacturing of solar panels.[3] The production of solar panels is a multi-phase process.[4] In the first phase, polysilicon is "melted, purified and cast into solid ingots, which are then cut into bricks."[5] In the second phase, "the bricks are sawed to produce ultra-thin silicon wafers."[6] In the third phase, "chemical finishes

---

[1]    Complaint ("Compl.") ¶ 11.

[2]    *See id.*

[3]    *See id.* ¶ 12.

[4]    *See id.* ¶ 13.

[5]    *Id.*

[6]    *Id.*

2

and conductive elements are added to the surface of each wafer to transform it into a photovoltaic cell capable of gathering and transmitting electrical energy."[7] These multiple cells are then combined to form solar panels or modules.[8]

In 2006, Conergy commenced the construction of a solar panel manufacturing plant in Frankfurt (Oder).[9]  The plant was designed to include "high-technology precision saws and related specialized equipment" for the slicing of bricks and was intended to be the first of several factories that would have positioned Conergy as a major competitor in the market for solar wafers, cells, and panels.[10]  In the summer of 2007, the plant produced its first solar panel.[11]  A year later, the facility became fully operational.[12]

MEMC is one of a few polysilicon manufacturers in the global market.[13]  In 2007, Conergy attempted to negotiate with numerous polysilicon

---

[7]     *Id.*

[8]     *See id.*

[9]     *See id.* ¶ 14.

[10]    *Id.*

[11]    *See id.* ¶ 22.

[12]    *See id.*

[13]    *See id.* ¶ 15.

3

manufacturers for the purchase of the raw material, but because of polysilicon shortages at the time, soon discovered that MEMC was the only manufacturer that could fulfill its needs.[14]

### 2.    The Wafer Supply Agreement

Conergy and MEMC entered into the Wafer Supply Agreement on October 25, 2007.[15]  The Agreement was assigned by MEMC to MEMC Singapore, its wholly-owned subsidiary, on or about October 26, 2007.[16]  The first contract year under the Agreement began on July 1, 2008 and ended on June 30, 2009.[17]

The Agreement provides for the purchase of solar wafers instead of polysilicon, which Conergy alleges MEMC was able to insist upon because of its "unique market power."[18]  An agreement for the purchase of solar wafers was contrary to Conergy's plan of manufacturing the wafers itself.[19]  MEMC was also

---

[14]    *See id.* ¶ 16.

[15]    *See id.* ¶ 23.

[16]    *See id.* ¶ 40.

[17]    *See id.* ¶ 25.

[18]    *Id.* ¶ 16, 18.

[19]    *See id.* ¶ 18.

4

able to negotiate a ten-year agreement with Conergy under which Conergy was to

purchase escalating quantities of its wafers.[20]  In addition, under a "take or pay"

provision in the contract, Conergy is required to provide defendants with a Letter

of Credit and a Refundable Capacity Reservation Deposit ("RCRD") that covers

the total contract price payable for the minimum quantity of silicon wafers.[21]

According to the Agreement, defendants are entitled to withhold sums from the

RCRD if there is a purchase shortfall in any contract year.[22]

     The Agreement also includes a non-compete provision, under which

Conergy agrees not to compete with MEMC in any of its or MEMC Singapore's

businesses.[23]  Although the Agreement includes a reciprocal non-compete

---

[20]    *See id.* ¶ 17.

[21]    *See id.* ¶¶ 29, 32, 33.

[22]    *See id.* ¶ 32.

[23]    *See id.* ¶ 18.  Section 2.12(a) of the Agreement provides, in pertinent part: " . . . except as may be agreed to in writing by MEMC in advance of engaging in any activities, Conergy shall not, and shall cause each of its affiliates and Subsidiaries to not, directly or indirectly, engage in any Restricted Conergy Business anywhere in the world including (A) owning any interest in, managing, operating, controlling or participating in any Person which owns or operates a Restricted Conergy Business, (B) soliciting any customer or prospective customer of MEMC anywhere in the world to purchase any products or services which compete with those provided by MEMC and (C) assisting any Person in any way to do, or attempt to do, anything prohibited above; *provided, however*, that the ownership by Conergy as of the date of this Agreement of the existing installed and ordered 32 wire saws and related downstream wafering equipment . . . shall be

provision that restricts defendants' right to compete with Conergy, Conergy denies

that it requested this provision and alleges that defendants have never had the

capacity or intention to enter into the market for solar cells and panels.[24]

Finally, the contract includes a provision giving MEMC the right of

first refusal on Conergy's wafer cutting saws should Conergy decide to sell them.[25]

Conergy alleges that such provision is "particularly onerous" because it fails to

impose a further obligation on MEMC to purchase the other substantial and

related plant and equipment Conergy had planned to build and install.[26]

### 3.    Amendment of the Agreement

On or about July 1, 2008, Conergy and MEMC Singapore entered

into Amendment No. 1 to the Agreement ("the Amendment").[27]  The Amendment

reduced the quantities of silicon wafers to be purchased by Conergy, the prices of

---

permitted."  Agreement, Ex. 2 to Affirmation of William J. Hibsher, defendants'
counsel, at 14 (emphasis in original).  The provision further permits Conergy to
use the saws and other equipment only for the purpose of producing wafers for
"internal consumption by Conergy."  *See id.*

[24]     *See* Compl. ¶ 38.

[25]     *See id.* ¶ 19.

[26]     *Id.*

[27]     *See id.* ¶ 41.

such wafers, and correspondingly, the RCRD and Letter of Credit amounts.[28]  The

Amendment did not, however, change any of the other restrictive terms of the

contract.[29]

　　　　In accordance with the Amendment, Conergy has provided MEMC

Singapore with the required RCRD payment and Letter of Credit for the first year

of the contract from July 1, 2008 to June 30, 2009.[30]  MEMC Singapore has the

right to draw on the Letter of Credit in the case of a purchase shortfall or if

Conergy fails to replace the Letter of Credit by July 1, 2009.[31]  At the time the

Complaint was filed, there had been no purchase shortfall.[32]  The Amendment

requires Conergy to provide MEMC Singapore with a new Letter of Credit for

over $100 million within seven business days after July 1, 2009.[33]

　　　　Conergy alleges that it will suffer "severe hardship and irreparable

harm" if it is either required to provide the Letter of Credit to MEMC Singapore

---

[28]  *See id.*

[29]  *See id.*

[30]  *See id.* ¶ 42.

[31]  *See id.* ¶ 44.

[32]  *See id.* ¶ 46.

[33]  *See id.* ¶ 45.

on July 1, 2009 or if MEMC Singapore draws on the existing Letter of Credit due to Conergy's failure to provide a substitute Letter of Credit.[34]  Although Conergy approached defendants in January 2009 in an attempt to resolve the disputes in this lawsuit, defendants notified Conergy on April 22, 2009 that they would not agree to modify the contract.[35]

## B.   Procedural History

On April 27, 2009, Conergy filed this action in New York state court. In the Complaint, Conergy asserts eight causes of action.  Defendants removed this action to federal court on May 26, 2009.

In the first cause of action, Conergy seeks a declaration that the "take or pay" provision of the contract is void and unenforceable as a contractual penalty clause that is impermissible under New York law.[36]  In the second to seventh causes of action, Conergy seeks declarations that the Agreement is void and unenforceable under Section 1 of the Sherman Act, Article 81 of the European Community Treaty, the New York Donnelly Act, New York common law, New

---

[34]   See id. ¶ 47.

[35]   See id. ¶ 48.

[36]   See id. ¶¶ 49-58.

8

York public policy, and the antitrust laws of various other states.[37]  Finally, the

eighth cause of action alleges that defendants breached the Agreement by

delivering wafers that do not conform to specification and by stopping shipments

of wafers that Conergy ordered and acknowledged pursuant to the Agreement.[38]

On July 28, 2009, defendants moved to dismiss the *per se* claim under section 1 of

the Sherman Act – the second cause of action – and the Donnelly Act claim – the

fourth cause of action.[39]  Defendants also moved to dismiss the eighth cause of

action for breach of contract.[40]

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, the court must "accept as true all of the factual

allegations contained in the complaint"[41] and "draw all reasonable inferences in

---

[37]   *See id.* ¶¶ 59-124.

[38]   *See id.* ¶¶ 125-129.

[39]   *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Certain Claims in Plaintiff's Complaint ("Def. Mem.") at 1-2.

[40]   *See id.* at 2.

[41]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

the plaintiff's favor."[42]  However, the court need not accord "[l]egal conclusions,

deductions or opinions couched as factual allegations . . . a presumption of

truthfulness."[43]

   To survive a 12(b)(6) motion to dismiss, the allegations in the

complaint must meet a standard of "plausibility."[44]  A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."[45]

Plausibility "is not akin to a probability requirement;" rather plausibility requires

"more than a sheer possibility that a defendant has acted unlawfully."[46]  Pleading a

fact that is "merely consistent with a defendant's liability" does not satisfy the

plausibility standard.[47]  "Where the well-pleaded facts do not permit the court to

---

  [42] *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

  [43] *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation omitted). *Accord Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949 (May 18, 2009).

  [44] *See Twombly*, 550 U.S. at 564.

  [45] *Iqbal*, 129 S. Ct. at 1949 (quotation omitted).

  [46] *Id.* (quotation omitted).

  [47] *Id.* (quotation omitted).

infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."[48]

## B.    Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."[49]  "[The Supreme] Court has not taken a literal approach to this language," and has "recognized that Congress intended to outlaw only unreasonable restraints.'"[50] Thus, "[the] Court presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful."[51]

"*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'"[52]  "'To justify a *per se* prohibition a restraint must have

---

[48]    *Id.* at 1950 (internal quotations marks and citation omitted).

[49]    15 U.S.C. § 1.

[50]    *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

[51]    *Id.*

[52]    *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 316 (2d Cir. 2008) (quoting *Dagher*, 547 U.S. at 5).

manifestly anticompetitive effects, . . . and lack . . . any redeeming virtue . . . .'"[53]

In addition, the Supreme Court has hesitated to impose *per se* liability "'where the

economic impact of certain practices is not immediately obvious.'"[54] "Resort to

*per se* rules is confined to restraints . . . 'that would always or almost always tend

to restrict competition and decrease output.'"[55] "Restraints that are *per se*

unlawful include horizontal agreements among competitors to fix prices . . . or to

divide markets."[56]

      An agreement not to compete between two actual or potential

competitors may be *per se* illegal.[57] Although courts have not defined what a

"potential competitor" is for the purpose of determining whether there has been a

violation of the Sherman Act, courts have looked to the following factors to

---

[53]    *Id.* (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (internal quotation marks omitted)).

[54]    *Dagher*, 547 U.S. at 5 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

[55]    *Leegin*, 551 U.S. at 886 (quoting *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)).

[56]    *Id.* (citations omitted).

[57]    *See Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints.").

determine whether a plaintiff is a potential competitor such that it has standing to
sue under the Clayton Act[58]: 1) "the background and experience of plaintiff in the
prospective business; 2) affirmative acts of plaintiff with the object of entering the
proposed business; 3) the ability of plaintiff to finance operation of the business
and the purchase of necessary equipment and facilities; and 4) the formation of
contracts by plaintiff."[59]

### C.    Donnelly Act

New York's Donnelly Act provides that contracts or agreements for
monopoly or in restraint of trade are illegal and void "in the conduct of any
business, trade or commerce or in the furnishing of any service in this state."[60]
Although the New York Court of Appeals has not specifically determined when
the Donnelly Act is preempted by the Sherman Act, "New York courts have

---

[58]    Section 4 of the Clayton Act provides for a private cause of action for
violations of the antitrust laws. *See* 15 U.S.C. § 15.

[59]    *Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 736 F. Supp. 511,
517 (S.D.N.Y. 1990) (citing *Waldron v. British Petroleum Co.*, 231 F. Supp. 72,
81-82 (S.D.N.Y. 1964)). I note that the Fifth Circuit has considered some of these
factors in determining whether a plaintiff was a "potential competitor" in the
context of considering whether a contract was a *per se* violation of the Sherman
Act. *See Transource Int'l, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274, 280 (5th Cir.
1984).

[60]    N.Y. Gen. Bus. Law § 340(1).

13

determined that '[w]here the conduct complained of principally affects interstate

commerce, with little or no impact on local or intrastate commerce, it is clear that

federal antitrust laws operate to preempt the field . . . .'"[61]

### D.    Breach of Contract

"To make out a viable claim for breach of contract a 'complaint need

only allege (1) the existence of an agreement, (2) adequate performance of the

contract by the plaintiff, (3) breach of contract by the defendant, and (4)

damages.'"[62]

## IV.   DISCUSSION

### A.    Sherman Act

Defendants argue that Conergy has failed to allege that it is a

potential competitor of MEMC in the silicon wafer market, and that therefore

Conergy has failed to plausibly plead a *per se* violation of section 1 of the

---

[61]    *H-Quotient, Inc. v. Knight Trading Group, Inc.*, No. 03 Civ. 5889,
2005 WL 323750, at *4 (S.D.N.Y. Feb. 9, 2005) (quoting *Two Queens, Inc. v.
Scoza*, 745 N.Y.S.2d 517, 519 (1st Dep't 2002)). *Accord In re Wiring Device
Antitrust Litig.*, 498 F. Supp. 79, 82 (E.D.N.Y. 1980) ("Where, as here, all
defendants are unquestionably engaged in interstate commerce, those who are
damaged from an alleged restraint of trade find a remedy in the federal, not the
state, antitrust laws.").

[62]    *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337,
348 (2d Cir. 1996)).

Sherman Act.[63]  Defendants assert that in order to be considered a "potential

competitor," Conergy must allege that at the time the contract was executed it not

only had the intention to enter the new business, but was prepared to do so.[64]

Defendants contend that proper allegations include any background or experience

Conergy might have in the solar wafer business, its financial capacity to enter the

market, any equipment that it owns for the purpose of entering the market, and any

contracts that were consummated for the purpose of building its business in the

market.[65]

        Conergy responds that it need only proffer "plausible" allegations that

there is a potential rivalry between itself and defendants.[66]  It further argues that

the "preparedness plus intent" allegations that defendants assert are required were

---

[63]     *See* Def. Mem. at 9.  Defendants also contend that Conergy concedes
in the Complaint that MEMC is not a potential or actual competitor in the solar
panel market and therefore that a *per se* violation cannot be found on the basis of
the non-compete provision in the Agreement that allegedly favors Conergy.  *See
id.* at 11-12.  Conergy does not dispute this point.

[64]     *See id.* at 10.

[65]     *See* Reply Memorandum of Law in Support of Defendants' Motion to
Dismiss Certain Claims in Plaintiff's Complaint ("Def. Rep.") at 3.

[66]     *See* Plaintiff's Memorandum of Law in Opposition to Defendants'
Motion to Dismiss Certain Claims ("Pl. Mem.") at 7-8.

taken from cases that involve claims under section 4 of the Clayton Act rather than the Sherman Act and therefore that they are inapplicable in this case.[67]

I need not determine whether Conergy is required to plead the factors required to demonstrate injury pursuant to section 4 of the Clayton Act in this action because I find that Conergy has, in any event, sufficiently done so here. *First*, Conergy adequately alleges that it had planned and intended to enter the silicon wafer market.  Conergy alleges that it initially negotiated with MEMC for the purchase of polysilicon, the primary raw material for the production of silicon wafers.[68] Conergy notes additionally that MEMC's insistence that Conergy purchase wafers instead of polysilicon was contrary to Conergy's business plans, which consisted of performing its own casting and wafering.[69]  Conergy also alleges that its plans to build a number of factories "would have positioned [it] to become a major force in the market for *solar wafers*, cells and panels."[70]  Finally,

---

[67]     *See id.* at 9.

[68]     *See* Compl. ¶¶ 13, 16.  Conergy explains that the process for producing solar panels consists of first melting the polysilicon into bricks that are then sawed into silicon wafers. *See id.* ¶ 13.

[69]     *See id.* ¶ 18.

[70]     *Id.* ¶ 14 (emphasis added).

Conergy alleges that it would have entered the wafer market if not for the non-compete clause in the Agreement.[71]

*Second*, Conergy has sufficiently alleged that it was prepared to enter the market at the time the contract was executed. For instance, in its Complaint, Conergy explains that its primary business is "the planning and installation of solar photovoltaic systems to generate electricity from sunlight" and that by 2003, it had become one of the biggest solar businesses in Germany.[72] Although Conergy does not allege that it had specific expertise in silicon wafer manufacturing, it is plausible that Conergy had some knowledge of the processes of wafer manufacturing from its extensive background in the solar energy industry.

Conergy also alleges that – as part of its expansion plans into the solar panel market – it had begun constructing a facility equipped to manufacture solar wafers in 2006.[73] The Frankfurt (Oder) facility produced its first solar panel in the summer of 2007, prior to the execution of the Agreement.[74] Thus, at the

---

[71]    *See id.* ¶ 68.

[72]    *Id.* ¶ 11.

[73]    *See id.* ¶¶ 12, 16.

[74]    *See id.* ¶ 22.

17

time the parties entered the Agreement, Conergy was close to possessing the operational capabilities to enter the silicon wafer market.

Conergy further alleges that the Frankfurt (Oder) facility "was intended to be the first of a series of similar factories,"[75] suggesting that it likely possessed the financial resources to enter the market and compete with other manufacturers. Finally, Conergy alleges that it sought to enter into a purchase contract with various manufacturers of polysilicon with the intention of producing the silicon wafers itself and that it eventually came to an agreement with MEMC.[76]

Defendants repeatedly cite to the Fifth Circuit case of *Transource International, Inc. v. Trinity Industries, Inc.* for the proposition that in order to be considered a potential competitor, Conergy "must demonstrate that it had the 'financial ability to enter the market at the same level' as [defendants]."[77] Defendants appear to imply that Conergy must have the immediate capability to capture the same market share as defendants in the solar wafer market before it can be deemed a potential competitor. However, they point to no support for this position. In other antitrust cases, the term "same level" has been used to indicate a

---

[75]     *Id.* ¶ 14.

[76]     *See id.* ¶¶ 16-17.

[77]     Def. Mem. at 10 (citing *Transource*, 725 F.2d at 280); *id.* at 11.

18

horizontal relationship as opposed to a vertical relationship.[78]  Interpreting the

term "same level" to indicate that two parties occupy the same position in the

market – *i.e.*, wholesaler or retailer – rather than garner the same market share is a

more plausible reading of the Fifth Circuit's holding in *Transource*.  I therefore

reject defendants' argument.

Defendants further argue that it is not plausible to believe that

Conergy would be able to enter the market for silicon wafers when Conergy itself

admits in the Complaint that it had difficulty securing polysilicon.[79]  However, the

Complaint alleges only that Conergy was unable to secure sufficient polysilicon *to*

*supply its needs*; it does not state that it could not obtain *any* polysilicon.[80]  In any

case, whether it was possible for Conergy to enter the solar wafer market because

of a shortage of polysilicon is a question of fact that is not suitable for disposition

on a motion to dismiss.

---

[78]     *See, e.g., Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405,
408 (2d Cir. 1981) ("While restrictive agreements among independent business
entities at the *same level* of the market, so-called "horizontal" agreements, are
illegal per se, [] restraints imposed by a manufacturer or supplier upon its
distributor retailer-customers, so-called "vertical" restraints, can significantly
benefit competition and are permissible unless they violate the rule of reason.")
(citations omitted) (emphasis added).

[79]     *See* Def. Mem. at 11.

[80]     *See* Compl. ¶ 16.

Conergy will ultimately be required to demonstrate that it had the

capabilities and financial resources to enter the silicon wafer market at a later

stage of this litigation.  For now, Conergy has made sufficient factual allegations

that it was a potential competitor at the time that it entered into the Agreement

with MEMC, thereby rendering its claims against defendants plausible.

Defendants' motion to dismiss Conergy's second cause of action is therefore

denied.

**B.     Donnelly Act**

Defendants argue next that the Donnelly Act is preempted by the

Sherman Act in this case because the alleged conduct predominantly affects

interstate commerce rather than New York commerce.[81]  I agree.

The Donnelly Act makes clear that it applies to contracts in restraint

of trade relating to the "conduct of any business, trade or commerce or in the

furnishing of any service *in this state* . . . ."[82]  In addition, New York courts have

held that federal antitrust laws preempt the Donnelly Act where the alleged

---

[81]     *See* Def. Mem. at 12.

[82]     *Id.* (emphasis added).

20

conduct principally affects interstate commerce.[83]  Although Conergy argues that

the Complaint contains "numerous allegations showing the connection between

the underlying facts and the State of New York," the allegations that it highlights

are conclusory and pertain almost exclusively to the fact that the Agreement

contains a New York choice of law and choice of forum provision.[84]  The

Complaint is devoid of any specific factual allegations demonstrating that the

Agreement's restrictive provisions and defendants' alleged misconduct in coercing

Conergy to enter the Agreement affected intrastate commerce.

---

[83]     *See H-Quotient*, 2005 WL 323750, at *4; *Two Queens*, 745 N.Y.S.2d
at 519.  The cases that Conergy cites are not to the contrary.  The *Two Queens*
court held that federal antitrust laws preempt the Donnelly Act where the conduct
alleged principally affects interstate commerce. *See* 745 N.Y.S.2d at 519.  In *New
York v. Feldman*, the question before the court was whether the Attorney General
could bring an action on behalf of non-residents of New York for an alleged
scheme to rig bidding processes at public stamp auctions *held in New York. See*
210 F. Supp. 2d 294, 305-07 (S.D.N.Y. 2001).  In *Leader Theatre Corp. v.
Randforce Amusement Corp.*, the court noted the well-established rule that "states,
under their police power, can enact and implement legislation which affects
interstate commerce, when such commerce has significant local consequences" in
ruling that joint applicability of both the Sherman Act and a state antitrust statute
might be appropriate.  58 N.Y.S.2d 304, 307 (Sup. Ct. N.Y. Co. 1945).

[84]     Pl. Mem. at 14 (citing Compl. ¶¶ 9, 10 (alleging that the Agreement is
governed under New York law), 98 (alleging that restraints imposed by the
Agreement violate Conergy's rights to build its solar panel business in the state of
New York), 121 (alleging that market division provisions of the Agreement are
contrary to public policy of New York)).

In an attempt to overcome this deficiency, Conergy contends that the Complaint expressly alleges that the Agreement affects the entire silicon wafer market in the United States, of which New York is a part.[85]  It argues that pleading conduct that affects the commerce of the United States generally has been sufficient to allege a claim under the Donnelly Act.[86]  However, the case upon which it principally relies – *United States v. Microsoft Corporation*[87]– is inapposite.  In *Microsoft*, the court found that significant impact on intrastate commerce had been shown because millions of enterprises in each of the states of the United States used Microsoft products and certain competitors that were impacted by Microsoft's alleged practices operated in and employed citizens of all fifty states.[88]

Here, Conergy is a German corporation with its principal place of business in Hamburg.[89]  MEMC is incorporated in Delaware with its principal

---

[85]    *See* Pl. Mem. at 15.

[86]    *See id.*

[87]    87 F. Supp. 2d 30 (D.D.C. 2000).

[88]    *See id.* at 55.  *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301 (S.D.N.Y. 2003), is similarly irrelevant.  That court did not make any finding with respect to whether plaintiff had sufficiently pled intrastate commerce.  *See id.* at 332-33.

[89]    *See* Compl. ¶ 11.

place of business in Missouri.[90]  Finally, MEMC Singapore is incorporated in

Singapore and its principal place of business is also Singapore.[91]  Besides

conclusory allegations that "the relevant geographic scope of the Wafer Market is

worldwide" or alternatively, Germany, the European Union, or the United States,[92]

the Complaint does not allege any impact on New York specifically.  Nor is it

plain that any of the parties compete with New York producers, serve New York

customers, or employ citizens of the State of New York.  Without such allegations,

Conergy has not properly stated a claim under the Donnelly Act.  Defendants'

motion to dismiss Conergy's fourth cause of action is therefore granted.

### C.   Breach of Contract

Finally, defendants contend that "[t]he breach of contract claim must

be dismissed because Conergy has failed to allege its own performance anywhere

in the Complaint."[93]  Defendants' argument lacks merit.

Conergy entered the Wafer Supply Agreement with defendants for the

purpose of purchasing silicon wafers.  Its performance is thus satisfied by paying

---

[90]   *See id.* ¶ 12.

[91]   *See id.* ¶ 13.

[92]   *See id.* ¶¶ 62-63.

[93]   Def. Mem. at 15.

for defendants' products.  As noted, the Agreement includes a "take or pay"

provision that requires Conergy to make a RCRD payment and provide a Letter of

Credit each year to ensure payment of the minimum quantities of wafers it agreed

to purchase from defendants.[94]  Conergy alleges in the Complaint that it has "duly

provided MEMC Singapore with the required RCRD payment and [L]etter of

[C]redit for the first contract year under the [] Agreement."[95]  Significantly, it

further alleges that there has been no purchase shortfall since the execution of the

contract, indicating that Conergy, in accordance with the terms of the contract,

purchased at least the minimum quantities of solar wafers from defendants.[96]

It is unclear what other allegations defendants believe Conergy would

have to plead.  And defendants make no suggestion that Conergy has failed to

---

[94]     *See* Compl. ¶¶ 29, 32, 33.

[95]     *Id.* ¶ 42.

[96]     *See id.* ¶ 46.  Defendants may argue that Conergy fails to specifically
state that it paid for the products ordered, but I will not quibble over word choices.
Conergy's allegation that there has been no purchase shortfall to date indicates
that it ordered and paid for the required minimum quantities.

plead any specific allegations related to its performance.[97]  Accordingly,

defendants' motion to dismiss Conergy's eighth cause of action is denied.

## D.   Leave to Amend Complaint

Conergy has requested leave to amend its complaint to include

additional factual allegations as set forth in the Declaration of Dr. Andreas von

Zitzewitz, who is currently Manager of Purchasing, Logistics and Components

---

[97]      The cases upon which defendants rely are all inapposite. In all of the cases, the plaintiff failed to make even a general allegation that it had performed its obligations under the contract. *See Global Crossing Bandwidth, Inc. v. PNG Telecomms., Inc.*, No. 06 Civ. 6415, 2007 WL 174094, at *2 (W.D.N.Y. Jan. 22, 2007) ("In the instant case, plaintiff has alleged that the parties entered into a contract [], that PNG breached the contract [], and that Global Crossing has been damaged as a result of the breach []. Global Crossing has failed, however, to allege that it adequately performed under the contract."); *Udell v. Berkshire Life Ins. Co. of Am.*, No. 03 Civ. 2721, 2005 WL 1243497, at *5 (E.D.N.Y. May 25, 2005) ("[P]laintiff does not even generally allege performance of his [] remaining obligations under the [] insurance policy."); *Sony Fin. Servs., LLC v. Multi Video Group, Ltd.*, No. 03 Civ. 1730, 2003 WL 21396690, at *2 (S.D.N.Y. June 17, 2003) ("[The second counterclaim] fails to allege the terms of the Beta Site Test Agreement, the nature of the alleged breaches, or that the defendants actually performed their obligations under the contract.") (internal quotations omitted); *Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342, 1999 WL 544708, at *18 (S.D.N.Y. July 27, 1999) (dismissing breach of contract claim because plaintiff had not only failed to allege its own performance but had also failed to allege that it was excused from performing because of defendants' breach); *R.H. Damon & Co., Inc. v. Softkey Software Prods., Inc.*, 811 F. Supp. 986, 991 (S.D.N.Y. 1993) (finding that plaintiffs had only alleged that certain condition precedents had occurred rather than alleging that they had rendered services requiring compensation from defendants).

25

Group and a member of Conergy's executive board.[98]  The additional allegations appear to pertain to Conergy's Sherman Act and breach of contract claims, which the Court has determined were adequately pleaded.[99]  Nevertheless, leave to amend a complaint is freely given "when justice so requires."[100]  Because it is possible that Conergy will be able to remedy the deficiencies in its pleading with respect to its Donnelly Act claim, leave to amend is granted.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part.  An Amended Complaint may be filed within thirty (30) days of this Opinion and Order.  The Clerk of the Court is directed to close defendants' motion to dismiss (document no. 12) and Conergy's motion for leave to amend its complaint (document no. 19).  A status conference is scheduled for August 24, 2009 at 5 p.m.

---

[98]     *See* Pl. Mem. at 17; Declaration of Andreas von Zitzewitz ¶ 1.

[99]     For instance, the new allegations speak to the capacities of the Frankfurt (Oder) facility, *see* Compl. ¶ 2, Conergy's current production capabilities in silicon wafers, *see id.* ¶ 3, and Conergy's performance under the contract, *see id.* ¶ 4.

[100]     Fed. R. Civ. P. 15(a)(2).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
              August 13, 2009

## - Appearances -

**For Conergy:**

Derek J.T. Adler, Esq.
Erik B. Bond, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000

**For Defendants:**

William Jonas Hibsher, Esq.
Daniel P. Waxman, Esq.
Christopher R. Strianese, Esq.
Bryan Cave LLP
1290 Avenue of Americas
New York, NY 10104
(212) 541-2000